UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

AMANDA P.,[1]

Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

23-CV-312-LJV
DECISION & ORDER

---

On April 7, 2023, the plaintiff, Amanda P. ("Amanda"), brought this action under the Social Security Act ("the Act"). Docket Item 1. She seeks review of the determination by the Commissioner of Social Security ("Commissioner") that she is not disabled.[2] *Id.* On August 18, 2023, Amanda moved for judgment on the pleadings, Docket Item 8; on November 8, 2023, the Commissioner responded and cross-moved for judgment on the pleadings, Docket Item 13; and on November 21, 2023, Amanda replied, Docket Item 14.

---

[1] To protect the privacy interests of Social Security litigants while maintaining public access to judicial records, this Court will identify any non-government party in cases filed under 42 U.S.C. § 405(g) only by first name and last initial. Standing Order, Identification of Non-Government Parties in Social Security Opinions (W.D.N.Y. Nov. 18, 2020).

[2] Amanda applied for Disability Insurance Benefits ("DIB"). One category of persons eligible for DIB includes any adult with a disability who, based on her quarters of qualifying work, meets the Act's insured-status requirements. *See* 42 U.S.C. § 423(c); *Arnone v. Bowen*, 882 F.2d 34, 37–38 (2d Cir. 1989). The Social Security Administration uses a five-step evaluation process to determine eligibility for the DIB program. *See* 20 C.F.R. § 404.1520(a)(4).

For the reasons that follow, this Court denies Amanda's motion and grants the Commissioner's cross motion.[3]

## STANDARD OF REVIEW

"The scope of review of a disability determination . . . involves two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). The court "must first decide whether [the Commissioner] applied the correct legal principles in making the determination." *Id*. This includes ensuring "that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the Social Security Act." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citation modified) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). Then, the court "decide[s] whether the determination is supported by 'substantial evidence.'" *Johnson*, 817 F.2d at 985 (quoting 42 U.S.C. § 405(g)).

"Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "The substantial evidence standard means once an ALJ finds facts, [the court] can reject those facts only if a reasonable fact finder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (citation modified) (emphasis in original); *see McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is susceptible to more than one rational

---

[3] This Court assumes familiarity with the underlying facts, the procedural history, and the decision of the Administrative Law Judge ("ALJ") and refers only to the facts necessary to explain its decision.

interpretation, the Commissioner's conclusion must be upheld."). But "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson*, 817 F.2d at 986.

## DISCUSSION

### I. THE ALJ'S DECISION

On December 19, 2018, the ALJ found that Amanda had not been under a disability since March 22, 2016, the date her application was filed. *See* Docket Item 3 at 18. Amanda then appealed that finding to this Court, *see* Docket Item 3 at 341, and United States District Judge Elizabeth A. Wolford remanded the case with instructions for the ALJ to develop the record regarding Amanda's prior mental health treatment. *See id.*; *Amanda P. v. Comm'r of Soc. Sec.*, 545 F. Supp. 3d 40, 42 (W.D.N.Y. 2021). On remand, the ALJ again found that Amanda had not been under a disability since March 22, 2016. *See* Docket Item 3 at 341–42. The ALJ's decision was based on the five-step sequential evaluation process under 20 C.F.R. §§ 404.1520(a) and 416.920(a). *See id.* at 342–43.

At step one, the ALJ found that Amanda had not engaged in substantial gainful activity since applying for benefits on March 22, 2016. *Id.* at 344. At step two, the ALJ found that Amanda suffered from five severe, medically determinable impairments: multiple sclerosis ("MS"), fibromyalgia, depressive disorder, anxiety disorder, and migraine headaches. *Id.*

At step three, the ALJ found that Amanda's severe, medically determinable impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See id.* at 344–47. More specifically, the ALJ found that Amanda's physical impairments did not meet or medically equal listing 11.09 (multiple sclerosis). *Id.* at 344–45. Likewise, the ALJ found that Amanda's mental impairments did not meet or medically equal listings 12.04 (depressive, bipolar, or related disorders) or 12.06 (anxiety and obsessive-compulsive disorders). *Id.* at 345. In assessing Amanda's mental impairments, the ALJ found that Amanda was moderately impaired in: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing herself. *Id.* at 345–46.

Neither fibromyalgia nor migraine headaches are listed in Appendix 1, but the ALJ nevertheless considered whether Amanda's conditions met the listing criteria for two comparable conditions: inflammatory arthritis (14.09D) and epilepsy (11.02). *Id.* And the ALJ found that neither of Amanda's conditions were equal in severity to the related listings, "either individually or in combination with another impairment." *Id.*

The ALJ then found that Amanda had the residual functional capacity ("RFC")[4] to "perform light work as defined in [20 C.F.R. § 404.1567(b)]" except that:

> [Amanda can] lift and carry frequently up to twenty pounds [and] . . . occasionally twenty to 100 pounds; can sit [for] one hour continuously [and] four hours total; can stand and walk [for] up to four hours [with] 30 minutes continuous standing and 30 minutes

[4] A claimant's RFC is the most "an individual can still do despite his or her limitations . . . in an ordinary work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996). "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.*; *see Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999).

> continuous walk[ing]; [can] frequent[ly climb] ramps and stairs [but cannot climb] ladders, ropes, [or] scaffolds; [cannot be] expos[ed] to extreme heat, cold, wetness[,] or humidity; [cannot] work around hazards such as loud noise, unprotected heights, [or] dangerous moving mechanical parts; should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and other respiratory irritants; can understand, remember[,] and carry out simple instructions and tasks; can maintain attention and concentration for simple, unskilled work; [cannot have] supervisory duties, [] independent decision-making, [or] strict production quotas as with assembly line work; [can handle] minimal changes in work routine and processes; [and can have] occasional interaction with supervisors, coworkers[,] and the general public but [cannot do] team or tandem work.

*Id.* at 347.

At step four, the ALJ found that Amanda no longer could perform any past relevant work. *Id.* at 357–58. But given Amanda's age, education, and RFC, the ALJ found at step five that Amanda could perform substantial gainful activity as a mail clerk, labeler, or laundry sorter. *Id.* at 358–59; *see Dictionary of Occupational Titles* 209.687-026, 1991 WL 671813 (Jan. 1, 2016); *id.* at 920.687-126, 1991 WL 687992 (Jan. 1, 2016); *id.* at 361.687-014, 1991 WL 672991 (Jan. 1, 2016). The ALJ therefore found that Amanda had not been under a disability since the date her application was filed. *See* Docket Item 3 at 359.

## II. ALLEGATIONS

Amanda argues that the ALJ erred in three ways. Docket Item 8-1 at 1. First, she argues that the ALJ erred by not properly applying the treating physician rule to the opinion of Channa Kolb, M.D. *See id.* at 17–22. Along the same lines, she argues that the ALJ failed to properly evaluate the opinion of her treating nurse practitioner, Beth Tacca, NP. *See id.* at 22–24. Finally, she argues that the ALJ failed to follow Judge Wolford's remand instructions directing the ALJ to retrieve Amanda's treatment records

from Lakeshore Behavioral Health. *See id.* at 24–26. For the reasons that follow, this Court disagrees.

## III. ANALYSIS

### A. Dr. Kolb's Opinion

For claims filed before March 27, 2017, such as Amanda's, the so-called "treating physician rule" applies. *See* 20 C.F.R. § 404.1527(c); *see also Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) ("The SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant."). Under that rule, the ALJ must evaluate every medical opinion but generally should give greater weight to the medical opinions of treating sources—those who have an "ongoing treatment relationship" with a claimant—because those medical professionals are in the best position to provide a "detailed, longitudinal picture of [the claimant's] medical impairment[s]." 20 C.F.R. § 404.1527(c)(2). In fact, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported [sic] by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (second alteration in original) (quoting 20 C.F.R. § 404.1527(c)(2)).

If an ALJ decides that a treating physician's opinion is not entitled to controlling weight, then "[the ALJ] must *explicitly* apply the factors listed in [section 404.1527]; the failure to do so is procedural error." *Schillo v. Kijakazi*, 31 F.4th 64, 75 (2d Cir. 2022) (emphasis in original). Those factors, sometimes referred to as the "*Burgess* factors," include: "(1) the frequency, length, nature, and extent of treatment; (2) the amount of

medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Id.* (citation modified) (quoting *Estrella v. Berryhill*, 925 F.3d 90, 95–96 (2d Cir. 2019)); *see Burgess*, 537 F.3d at 129.

On December 21, 2021, Dr. Kolb completed a treating medical source statement for Amanda. Docket Item 3 at 1444–50. Dr. Kolb found that Amanda had MS and noted issues with fatigue, balance, coordination, weakness, unstable walking, numbness, sensitivity to heat, difficulty remembering, and depression. *Id.* at 1444. Dr. Kolb also found that Amanda's MS both physically and mentally limited her ability to work and that her prognosis was "fair." *Id.* at 1444–49.

More specifically, Dr. Kolb opined that Amanda should only occasionally lift ten pounds, rarely lift twenty pounds, and never lift fifty pounds or more. *Id.* at 1447. Dr. Kolb found that Amanda's range of motion was limited and that she could only rarely twist, stoop, crouch, or climb stairs and never climb ladders. *Id.* at 1447. Dr. Kolb also found that Amanda could use her hands to grasp and turn objects only ten percent of the workday and could perform fine finger manipulations or reaching of her arms only twenty percent of the workday. *Id.* Dr. Kolb said that Amanda would need unscheduled breaks of twenty minutes every forty-five minutes to an hour during a typical eight-hour shift and that she should be limited to forty-five minutes of continuous sitting and thirty minutes of continuous standing for a total of less than two hours a day. *Id.* at 1446.

As to Amanda's mental limitations, Dr. Kolb identified moderate difficulties with understanding, remembering, or applying information; concentrating, persisting, or maintaining pace; and adapting or managing herself. *Id.* at 1449. Dr. Kolb found that

Amanda had only mild limitations when interacting or relating with others but that "[work] stress can exacerbate symptoms." *Id.* at 1445, 1449. Dr. Kolb's statement concluded that Amanda could tolerate "low stress jobs." *Id.* at 1445.

The ALJ assigned Dr. Kolb's opinion "little weight" because it was "inconsistent with the record and not supported by other evidence." *Id.* at 354. More specifically, the ALJ identified inconsistencies with Amanda's routine check-up on March 9, 2021, *id.* at 1177–84, where Dr. Kolb "observed that [Amanda] had normal motor strength in her bilateral shoulders, elbows, forearms, and wrists." *Id.* at 354–55. The ALJ found this to "be inconsistent with the . . . reaching, handling, and fingering" limitations about which Dr. Kolb opined. *Id.* The ALJ discounted the mental limitations that Dr. Kolb identified because they were "outside [Dr. Kolb's] area of expertise." *Id.* at 355. The ALJ instead credited the findings of Russell Lee, M.D., a general surgeon who completed an "Internal Medicine Consultative Examination" on July 19, 2022, and Janine Ippolito, Psy.D., a psychologist who completed a "Psychiatry Consultative Examination" on the same day.[5] *Id.* at 355, 357; *see id.* at 1451–62, 1465–72.

Amanda argues that the ALJ did not follow the treating physician rule in assessing Dr. Kolb's opinion; in the alternative, she argues that the ALJ did not provide "good reasons" for not assigning controlling weight to Dr. Kolb's opinion. Docket Item 8

---

[5] The ALJ directly addressed a psychiatry consult by Gina Zali, Psy.D. (2016); a neurology consult by John Schwab, D.O. (2016); Dr. Kolb's treating source statement (2021); Dr. Lee's internal medicine consult (2022); Dr. Ippolito's psychiatry consult (2022); and NP Tacca's "Physical Treating" medical source statement (2022) but found only the opinions of Drs. Lee and Ippolito to be reliable and consistent with the record. Docket Item 3 at 354–57.

at 17–18. But the ALJ followed the treating physician rule in assigning "little weight" to Dr. Kolb's opinion, and so this Court disagrees.

First, the ALJ explicitly applied the *Burgess* factors in evaluating Dr. Kolb's treating source statement. Docket Item 3 at 1442–50. The ALJ addressed the frequency, length, nature, and extent of treatment as well as the physician's specialty by explicitly noting that Dr. Kolb was a neurologist who had been Amanda's treating physician "since August 2016" and by reviewing the 193 pages of treatment records covering Dr. Kolb's care between 2016 and 2022. *Id.* at 354–55 (citing *id.* at 1138–1330). In fact, the ALJ discounted Dr. Kolb's opinion about Amanda's mental impairments precisely for the reason that *Burgess*'s fourth factor envisions: Dr. Kolb was not a specialist in mental health issues. *Id.* at 355.

The ALJ also explicitly addressed the amount of medical evidence supporting the opinion and the consistency of the opinion with other evidence in the medical record. For example, the ALJ found that Dr. Kolb's opinion that Amanda was limited in reaching, handling, and fingering was not supported by Dr. Kolb's own records which noted normal motor strength bilaterally in her shoulders, elbows, forearms and wrists. *Id.* at 354-55. And the ALJ explicitly found that Dr. Kolb's opinion was "inconsistent with . . . and not supported by other evidence in the record" as well. *Id*. at 354. So the ALJ explicitly applied all the *Burgess* factors.

The Court's inquiry does not end merely because the ALJ explicitly addressed the *Burgess* factors, however. Instead, as "[a] corollary to the treating physician rule," courts apply "the so-called good[-]reasons rule," which "require[s] the ALJ to give . . . reasons supported by substantial evidence in the record[] for the weight [he or] she

affords the treating source's medical opinion." *Harris v. Colvin*, 149 F. Supp. 3d 435, 441 (W.D.N.Y. 2016); *Schillo*, 31 F. 4th at 75. And this Court agrees with Amanda that some of the specific examples given for discounting Dr. Kolb's opinion are insufficiently supported by the record to meet the "good reasons" standard. But as the Commissioner observes, when considering the record as a whole, there still is "substantial evidence" sufficient to support a finding that Dr. Kolb's opinion merits "little weight." *See* Docket Item 3 at 354; Docket Item 13 at 15–16.

First, the record supports the ALJ's finding that Dr. Kolb's opinion was "inconsistent with" and "not supported by other evidence in the record." Docket Item 3 at 354. Amanda accurately observes that the ALJ specifically identified only one inconsistency—the limitations in reaching, handling and fingering—and "does not address" the rest of Dr. Kolb's opinion. Docket Item 8 at 19; *see also* Docket Item 13 at 354–55 (contrasting Dr. Kolb's finding of intact bilateral upper-body motor strength with the recommended limitations). But when making a finding of fact, an ALJ "need not recite every piece of evidence that contributed to the decision, so long as the record 'permits [the Court] to glean the rationale of an ALJ's decision.'" *Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)). And here, the ALJ engaged in a comprehensive review of Amanda's medical history and referred to other records that conflict with Dr. Kolb's findings. *See, e.g.*, Docket Item 3 at 355 (citing *id.* at 1459 (finding after examining Amanda in 2022 that she could "continuously" reach, handle, and finger with both hands)); *id.* at 353 (citing *id.* at 1521–22 (finding that motor strength in Amanda's shoulders, elbows, forearms, and wrists was "normal bilaterally," and that she had appropriate hand-eye

coordination and mostly normal sensation in her extremities)). And the record includes additional findings that enable this Court to "glean the rationale" of the ALJ's decision. *See, e.g.*, *id.* at 777 (describing Amanda's motor strength in her extremities as "5/5"), 1152 (confirming Amanda's normal motor strength, hand-eye coordination, and sensation in her extremities).

Moreover, "[e]ven [when] there is [substantial] evidence . . . to the contrary," *Barrere v. Saul*, 857 F. App'x 22, 24 (2d Cir. 2021), if there also is "substantial evidence in the record from which the ALJ could have reasonably ruled against the claimant," the court "defer[s] to the Commissioner's resolution of [the] conflicting evidence," *DeChirico v. Callahan*, 134 F.3d 1177, 1182–83 (2d Cir. 1998); *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012). Here, there is "substantial evidence to support either position" and thus "the determination is one to made by the factfinder." *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990); *see also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982) ("[F]actual findings of the [agency], if supported by substantial evidence, shall be conclusive," even if "our own interpretation of the evidence" might end in a different result).

For example, Dr. Lee's July 2022 opinion that Amanda could "continuously reach overhead, handle, finger, feel, and push/pull bilaterally" and could continuously "balance, stoop, kneel, crouch, and crawl" provides a substantial basis for the ALJ's finding that Dr. Kolb's restrictive opinion was inconsistent with the record. *Id.* at 355, 1459; *see id.* at 1451–62. And NP Tacca's physical examination in September of the same year validated Amanda's ability to feel, handle, and reach overhead; NP Tacca also found normal hand-eye coordination, that Amanda could move her hands through a

full range of motion while maintaining normal motor strength, and that Amanda had only slightly diminished sensation. *Id.* at 353, 1521–22. In sum, the ALJ correctly applied the treating physician rule and provided "good reasons" for discounting the opinion of Amanda's treating physician, Dr. Kolb.

Amanda also argues that the ALJ discounted Dr. Kolb's opinion as being "outside [Dr. Kolb's] expertise" based on a misunderstanding of the close relationship between neurological conditions such as MS and mental limitations. Docket Item 8 at 20. But the mere existence of mental disorders as a symptom of neurological disease does not transform Dr. Kolb into a psychiatrist or other mental health professional. Indeed, Dr. Kolb repeatedly referred Amanda to psychiatrists and counselors to treat her mental health issues. *See, e.g.*, Docket Item 3 at 280 (referring Amanda in 2017 to a social worker to assist in "finding the right therapist"); *id.* at 1189 (prescribing Xanax in 2020 "for severe anxiety" but recommending "referral to [a] psychiatrist [or] psychologist to address depression and anxiety"); *id.* at 1161 (confirming that Amanda has "started to see[] a counselor and a psychiatrist . . . through Bestself"); *id.* at 1153 (recommending a "follow [up] with psychiatry" in March 2022). And the fourth *Burgess* factor explicitly instructs ALJs to consider whether the treating physician is a specialist in the relevant field. *See Smith v. Berryhill*, 740 F. App'x 721, 724–25 (2d Cir. 2018) (validating ALJ's finding that mental health opinions from treating physician were outside her specialty and thus entitled to less weight); *see also* 20 C.F.R. § 404.1527(c)(5) (providing that treating physician's opinions are entitled to less weight when they are outside physician's specialty). So the ALJ did not err in discounting Dr. Kolb's opinion and

crediting a specialist—Dr. Ippolito, a psychiatrist—with respect to findings about Amanda's mental health.

Finally,[6] it is worth noting that the RFC includes several restrictions equal to or exceeding those about which Dr. Kolb opined and is largely consistent with Dr. Kolb's conclusion that Amanda could perform "low stress jobs." Docket Item 3 at 1445. For example, consistent with Dr. Kolb's opinion that Amanda could tolerate cold and wetness as long as it was not "extreme" or "concentrated," *id*. at 1448, 1461, the ALJ found that Amanda could not be exposed to extreme heat, cold, wetness, or humidity, *id.* at 347. The ALJ likewise found that Amanda could never climb ladders just as Dr. Kolb opined. *See id.* at 347. The ALJ limited Amanda to simple tasks and unskilled work with minimal changes to her work routine and no supervisory duties, independent decision-making, or production quotas, *see id*.—that is, to the low stress jobs that Dr. Kolb said she could do, *see id.* at 1445. And to the extent that the ALJ found restrictions less severe than Dr. Kolb's, he relied on the opinions of other physicians, *see id.* at 347, 355, 1457–58 (crediting Dr. Lee's more relaxed lift-and-carry and sit-stand restrictions), as he was entitled to do. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the [C]ommissioner to

[6] Amanda also argues that the ALJ incorrectly found Dr. Kolb's statement that Amanda's MS was "stable" to support the conclusion that she was not disabled. Docket Item 8 at 20–21. This Court agrees. The word stable, devoid of context, provides no insight as to a patient's disability; here, for example, Amanda's six years of consistent physical and mental limitations resulting from her MS puts "stable" in a negative light. *See generally* Docket Item 3 at 347–57; 1143–1335. But that does not warrant remand. If "stability" were the only evidence upon which the ALJ relied, then Amanda's argument might have some merit. But as noted above, the ALJ evaluated Dr. Kolb's opinion in light of the entire medical record—including the opinions of other providers. *See, e.g.*, *id.* at 353 (citing *id.* at 1521–22); *id.* at 355 (citing *id.* at 1459).

resolve.”); *Richardson*, 402 U.S. at 399 (“The trier of fact has the duty to resolve [conflicting medical evidence.]”).

In sum, the ALJ correctly applied the treating physician rule, and a searching review of the record convinces the Court that the ALJ indeed had “good reasons” for discounting Dr. Kolb’s opinion. The ALJ could have addressed the lack of support for and inconsistency of Dr. Kolb’s opinion in more detail. But the record contains more than enough contradictory medical evidence that a “reasonable mind might accept as adequate” to assign less-than-controlling weight to the opinion of Amanda’s treating physician. *Id.* at 401 (citation modified).

### B. The ALJ’s Review of Nurse Practitioner Tacca’s Opinion

As discussed above, the applicable regulations require an ALJ to evaluate every medical opinion “[r]egardless of its source” and to resolve “[g]enuine conflicts” among them. 20 C.F.R. § 404.1527(c); *Burgess*, 537 F.3d at 128 (citation omitted). But the level of deference due when evaluating medical opinions depends on the qualifications of their authors. Controlling weight may be given only to “treating sources” who also are “acceptable medical sources,” defined as “licensed physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists.” *Genier v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008) (quoting 20 C.F.R. § 416.913(a) and SSR 06-03P, 2006 WL 2329939, at *2 (Aug. 9, 2006)). All other professionals are “other sources,” and an ALJ is “free to discount” their medical opinions “in favor of the objective findings of . . . medical doctors.” 20 C.F.R. § 404.1527(c); *see Genier*, 298 F. App’x at 108–09.

Nevertheless, an ALJ's evaluation of opinions from "other sources" should not be conclusory. Rather, the ALJ "should explain the weight given to opinions from these 'other sources,'" such that "a claimant or subsequent reviewer [may] follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03P, 2006 WL 2329939, at *6 (quoting 20 C.F.R. § 404.1527(f)(2)). Thus, an ALJ may weigh the opinion of a nurse practitioner—even one such as NP Tacca who has a robust, "treating source" relationship with the claimant—differently than that of a treating physician as long as the ALJ provides sufficient reasons for doing so.

Amanda argues that the ALJ "failed to properly evaluate NP Tacca's opinion" and, in doing so, "mischaracterized the evidence" in such a way that his determination is unsupported by substantial evidence. Docket Item 8 at 22–24. This Court disagrees. Not only did the ALJ follow the applicable procedural requirements, but the record contains enough contradictory evidence to provide a "substantial basis" for discounting NP Tacca's opinion.

On November 16, 2022, NP Tacca completed a physical treating medical source statement for Amanda. *See* Docket Item 3 at 1539–43. NP Tacca opined that Amanda could sit or stand for only twenty minutes at a time and for less than two hours total in an eight-hour workday; could frequently lift less than ten pounds, rarely lift twenty pounds, and never lift fifty pounds or more; and could only occasionally twist and climb stairs, rarely stoop or crouch, and never climb ladders. *Id.* at 1540–42. NP Tacca also opined that Amanda would require a ten-to-fifteen-minute break every half hour and would need to walk around for ten minutes every twenty minutes. *Id.* at 1541.

NP Tacca concluded that Amanda's symptoms would constantly interfere with her attention and concentration, that she would be absent from work more than four days per month, and that she was "incapable of even 'low stress' jobs." *Id.* at 1540, 1542.

The ALJ assigned NP Tacca's opinion "little weight" largely for the same reasons that he discounted Dr. Kolb's: it was "inconsistent with the record" and not supported by "other evidence." *Id.* at 356. For example, the ALJ noted an inconsistency between NP Tacca's diagnosis of depression and anxiety and Amanda's self-proclaimed good mood and lack of psychiatric treatment. *Id.* In doing so, the ALJ considered the factors in section 404.1527(c), addressing the length, nature, and extent of the treating relationship, by acknowledging NP Tacca's role as Dr. Kolb's assisting nurse practitioner and referring to treatment notes from multiple appointments. *Id.* at 355–56; *see id.* at 1515–35 (treatment records), 1535–45 (treating source statement); 20 C.F.R. § 404.15627(c)(1)–(3). And the ALJ discounted NP Tacca's opinion precisely because it was inconsistent with other medical evidence in the record, one of the two "most important" factors in "evaluat[ing] the persuasiveness of medical opinions." *Spottswood v. Kijakazi*, 2024 WL 89635 at *1 (2d Cir. Jan. 9, 2024).

NP Tacca's opinion broadly mirrors Dr. Kolb's; indeed, it is *more* restrictive. So just as the contradictory medical evidence evaluated in detail by the ALJ provided good reason to discount Dr. Kolb's opinion, so that same evidence provides good reason to discount NP Tacca's findings. Because "an ALJ is free to . . . choose between properly submitted medical opinions," and especially because "other sources" are entitled to less deference than treating medical sources, the ALJ's discounting of NP Tacca's opinion was not error. *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (quoting *McBrayer v.*

*Sec'y of Health and Hum. Servs.*, 712 F.2d 795, 799 (2d Cir. 1983); *see* 20 C.F.R. § 404.15627(f).

**C. ALJ's Duty to Develop the Record**

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative duty to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). Thus, "where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history 'even when the claimant is represented by counsel or . . . by a paralegal.'" *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (quoting *Perez*, 77 F.3d at 47). But "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa*, 168 F.3d at 79 n.5; *see also Janes v. Berryhill*, 710 F. App'x 33, 34 (2d Cir. 2018) (summary order) (An ALJ "is not required to develop the record any further when the evidence already presented is adequate for [the ALJ] to make a determination as to disability.") (citation modified).

Amanda argues that the ALJ failed to develop the record in accordance with Judge Wolford's instructions on remand. *See* Docket Item 8, at 24–26 (citing Docket Item 3, at 476–80). More specifically, Amanda says that the ALJ's failure to obtain additional counseling, psychiatric, and neuropsychological records from Lakeshore Behavioral Health merits remand. Docket Item 8 at 25–26. Again, this Court disagrees.

Judge Wolford's remand order directed the ALJ to "work to obtain a complete medical history for [Amanda], particularly with regard to any mental health treatment records, including by obtaining the records for the [Lakeshore Behavioral Health

treatment].” *Amanda P. v. Comm’r of Soc. Sec.*, 545 F. Supp. 3d 40, 49 (W.D.N.Y. 2021). Judge Wolford was concerned that there were no records of mental health treatment or testing, especially given the ALJ’s incorrect statement that “aside from medication, there is no indication from the record of dedicated mental health treatment.” *See id.* at 48 (explaining that Dr. Kolb’s medical opinions directly referred to Amanda’s treatment at Lakeshore) (quoting Tr. at 22, *Amanda P.*, 545 F. Supp. 3d at 48 (No. 1:20-CV-306)). Judge Wolford also noted Amanda’s *pro se* status and the relatively sparse medical record as additional reasons to remand. *Id.* at 48–49 (stating that the record was “not voluminous, totaling only 149 pages” and explaining the heightened duty to develop the record for *pro se* claimants). On remand, the ALJ addressed each of those concerns.

First, the ALJ made reasonable efforts to obtain the Lakeshore records and proceeded without them only in reliance on Amanda’s counsel. As Judge Wolford noted, *id.*, an ALJ has a “heightened” duty to develop the record for pro se claimants. *Morris v. Berryhill*, 721 F. App’x 25, 27 (2d Cir. 2018). But on rehearing, Amanda retained counsel. And while an ALJ still is obliged to develop the record “even when a claimant is represented by counsel,” *Perez*, 77 F.3d at 47, that duty is lessened when counsel assures the ALJ that the record is complete, *see, e.g.*, *Curley v. Comm’r of Soc. Sec. Admin.*, 808 F. App'x 41, 43 (2d Cir. 2020) (summary order) (“Curley's argument that the ALJ failed to develop the record . . . fails. When the ALJ discussed the medical records with Curley and his attorney at the beginning of the hearing and asked whether anything was missing, Curley did not state that he had any [additional] records that needed to be obtained.”); *Christopher V. v. Comm’r of Soc. Sec.*, 2026 WL

931145 at *8 (W.D.N.Y. Apr. 7, 2026) (faulting plaintiff for "fail[ing] to provide" relevant records even after prompting by the ALJ).

Amanda's counsel made several such assurances here. *See* Docket Item 3 at 371–73. When the hearing began, counsel said that "all [the] requested records are in." *Id.* at 371. The ALJ then asked whether "[i]n particular, all of the records that were requested by the remand order are now in the file[,]" and counsel replied in the affirmative. *Id.* The ALJ pressed further, asking whether the record included the "neuropsych testing" and "psychiatric treatment" records, and he confirmed with counsel that there were "no other missing medical [records]." *Id.* at 371–72. The ALJ also confirmed that the Best Self records "encompass[ed] the whole of that treatment."[7]

When the hearing turned to Amanda's mental health treatment, *id.* at 394–96, the ALJ explicitly asked whether the record included documents from Lakeshore Behavioral Health, *id.* at 395. Counsel responded that no additional Lakeshore records had been procured because Lakeshore was "out of business" and counsel therefore "w[as] unable to do a request for [those records]." *Id.* The ALJ then confirmed, "just so we're clear, the [district c]ourt identified those as being records that should be obtained. You looked into that, attempted to obtain them, and they were essentially unobtainable." *Id.* Once

[7] Judge Wolford specifically referred to records from Lakeshore Behavioral Health. *Amanda P.*, 545 F. Supp. 3d at 48. Lakeshore Behavioral Health became Best Self Health before Amanda's first claim for disability benefits. *See* Best Self Behavioral Health, Inc. (Formerly Lake Shore), N.Y. Dep't of Health (last visited Oct. 22, 2026) https://www.health.ny.gov/health_care/medicaid/program/medicaid_health_homes/hh_map/homes/bestself.htm. So the ALJ's inquiry about the Best Self records covered what Judge Wolford's remand order required. And during the hearing on remand, the only records relating to that treatment were references in Dr. Kolb's notes and a discharge summary from Best Self. *See* Docket Item 3 at 1491–95.

again, counsel said yes, explaining that Lakeshore was "out of [] business at this time." *Id.*

Amanda's argument suggests that even after counsel repeatedly tells an ALJ that the medical record is complete, a claimant is entitled to remand if counsel's representations misled the ALJ. To permit that argument to succeed would fly in the face of the principles of judicial fairness and efficiency. Indeed, this Court and others in this Circuit have consistently upheld the ALJ's development of the record in similar situations. *See, e.g.*, *David C. v. Comm'r of Soc. Sec.*, 2024 WL 4347151 at *12–15 (W.D.N.Y. Sept. 30, 2024) (warning that counsel should not be allowed to "game the system" by asserting a complete record and then later "crying foul"); *Christopher V.*, 2025 WL 931145 at *8 (refusing to remand where counsel initially represented a complete record); *Jason C. v. Berryhill*, 2019 WL 1409804, at *5 (N.D.N.Y. Mar. 28, 2019) (collecting cases holding same); *see also Nichole T. v. Comm'r of Soc. Sec.*, 2024 WL 3378109, at *3 (W.D.N.Y. July 11, 2024) (reminding counsel of duty to obtain missing records that may impact an ALJ's decision).

Judge Wolford's other concerns about the breadth of the available medical and psychiatric records also were addressed at the rehearing. The ALJ reviewed nearly 800 pages of additional medical records, including two psychiatric evaluations,[8] Docket Item 3 at 356–57, one by Gina Zali, Psy.D., conducted on May 23, 2016, *id.* at 196–99, and a more recent evaluation by Dr. Ippolito conducted on July 19, 2022. *Id.* at 1465–73.

[8] The additional medical records also included voluminous neurological records, largely reflected in Dr. Kolb's and NP Tacca's medical opinions.

What is more, Dr. Ippolito's more recent consultative examination—which found Amanda to be only moderately limited by her mental conditions—provided ample basis for the RFC determination. *See id.* at 345–46 (explaining that Amanda's moderate limitations did not meet the paragraph B or C requirements for mental disability). Indeed, Dr. Ippolito's 2022 report arguably obviated the need for the 2016 Lakeshore records, which would have said little about Amanda's current condition.

The ALJ appropriately relied on the representations of counsel regarding the Lakeshore Behavioral Health records, and he obtained the other records that Judge Wolford directed him to obtain. For that reason, the ALJ did not commit "an error of law . . . that might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004).

## CONCLUSION

The ALJ's decision was not contrary to the substantial evidence in the record, nor did it result from any legal error. Therefore, and for the reasons stated above, Amanda's motion for judgment on the pleadings, Docket Item 8, is DENIED, and the Commissioner's cross motion for judgment on the pleadings, Docket Item 13, is GRANTED. The complaint is DISMISSED, and the Clerk of Court shall close the file.

SO ORDERED.

Dated: October 27, 2026
Buffalo, New York

***/s/ Lawrence J. Vilardo***
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE